# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

---

No. 22-1033

---

**United States of America,**

Plaintiff-Appellee,

v.

**Victor Devon Edwards,**

Defendant-Appellant.

---

Appeal from the United States District Court
for the District of Minnesota

---

APPELLANT'S OPENING BRIEF

---

Sarah Weinman
Assistant Federal Defender
Office of the Federal Defender of Minnesota
U.S. Courthouse, Suite 107
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5858

*Counsel for Mr. Edwards*

# SUMMARY AND REQUEST FOR ORAL ARGUMENT

When the government presented its arson case against Mr. Edwards at trial, it elicited testimony about the "large[]" fires at Target and at Brit's Pub on August 26, 2020. It showed the jury video footage of a shadowy figure near the Target fire. And it showed footage of a fire at Brit's Pub after Mr. Edwards entered the pub.

But the government had not charged Mr. Edwards with the arson of Brit's Pub. It charged him only with arson of Target. Defense counsel objected to the Brit's Pub fire footage as unfairly prejudicial, confusing the issues, misleading, and unduly cumulative under Federal Rule of Evidence 403, and proposed substitute evidence.

The district court was required to balance the dangers of the Brit's fire footage and proposed substitute evidence against their probative value. But it did not do so. Instead, it simply ruled that the evidence was relevant. This was legal error. And the court's admission of the Brit's Pub fire footage was an abuse of discretion because the risk of Rule 403 dangers substantially outweighed the evidence's probative value and substitute evidence was available. Because the government cannot prove harmlessness, this Court should reverse and remand for a new trial.

This Court should alternatively remand for a new sentencing hearing. The district committed significant procedural error in failing to respond to Mr. Edwards' nonfrivolous mitigation arguments. And it imposed a sentence that was substantively unreasonable. Mr. Edwards requests fifteen minutes of oral argument per side.

# TABLE OF CONTENTS

**Page**

SUMMARY AND REQUEST FOR ORAL ARGUMENT ............................................. i

TABLE OF AUTHORITIES ........................................................................ iv

JURISDICTIONAL STATEMENT ............................................................... 1

ISSUES PRESENTED ............................................................................. 2

STATEMENT OF THE CASE .................................................................... 3

   I. The night of August 26, 2020 ........................................................... 3
   II. Mr. Edwards' trial ......................................................................... 4
      A. The government's case-in-chief .................................................. 5
         1. The phone evidence used to prove the riot charge ...................... 5
         2. Video evidence depicting events at Saks Off Fifth and near the Ruth's Chris Steakhouse, used to prove the riot charge ......................... 6
         3. Video evidence of the fire in Target, used to prove the arson charge ...... 7
         4. The Brit's Pub video, a portion of which admitted over Mr. Edwards' Rule 403 objection ............................................ 10
      B. Closing arguments ................................................................. 15
      C. Verdict .............................................................................. 17
   III. Mr. Edwards' sentencing. ............................................................. 17
      A. The pre-sentence report and government recommendation ................. 17
      B. Mr. Edwards' recommendation .................................................. 18
      C. The sentencing hearing ........................................................... 20

SUMMARY OF THE ARGUMENT ........................................................... 25

ARGUMENT ..................................................................................... 28

   I. The district court erred by admitting evidence of the Brit's Pub fire over Mr. Edwards' Rule 403 objection ..................................................... 28
      A. Standard of review ................................................................. 28
      B. The district court misinterpreted Rule 403 by failing to conduct the required balancing test ..................................................................... 28
      C. The district court abused its discretion in admitting the Brit's fire footage. 31
      D. The government cannot prove that the error was harmless ..................... 33

II. The district court committed significant procedural error by failing to address defense counsel's arguments at sentencing............................................................ 36

   A. Standard of review ............................................................................ 36

   B. The district court failed to adequately address defense counsel's arguments regarding unwarranted sentencing disparities.................................... 36

   C. The district court's error in failing to respond to Mr. Edwards' arguments requires reversal. ............................................................................. 40

   D. The sentence imposed was substantively unreasonable. ............................... 41

CONCLUSION ........................................................................................... 52

ADDENDUM

   Judgment and Commitment Order .................................................... ADD-1

   Trial Transcript Pages 214–222; 292–297 ......................................... ADD-8

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bruton v. United States,*
    391 U.S. 123 (1968)..................................................................... 35

*Gall v. United States,*
    552 U.S. 38 (2007)....................................................................... 36

*Old Chief v. United States,*
    519 U.S. 172 (1997)...........................................................28, 29, 30

*Rita v. United States,*
    551 U.S. 338 (2007)............................................. 2, 36, 37, 39, 40

*United States v. Becht,*
    267 F.3d 767 (8th Cir. 2001).................................................. 2, 29

*United States v. Betcher,*
    534 F.3d 820 (8th Cir. 2008)...................................................... 29

*United States v. Bigley,*
    786 F.3d 11 (D.C. Cir. 2015) (per curiam)............................... 37

*United States v. Carroll,*
    207 F.3d 465 (8th Cir. 2000)...................................................... 33

*United States v. Clay,*
    622 F.3d 892 (8th Cir. 2010)...................................................... 36

*United States v. Coutentos,*
    651 F.3d 809 (8th Cir. 2011).................................................29, 33

*United States v. Crenshaw,*
    359 F.3d 977 (8th Cir. 2004).................................................33, 35

*United States v. Cunningham,*
    429 F.3d 673 (7th Cir. 2005)...................................................... 39

*United States v. Feemster,*
    572 F.3d 455 (8th Cir. 2009) (en banc) ................................... 36

*United States v. Fisher,*
    861 F.3d 802 (8th Cir. 2017)...................................................... 36

*United States v. French,*
    719 F.3d 1002 (8th Cir. 2013).................................................... 36

*United States v. Friedman,*
    658 F.3d 342 (3d Cir. 2011) ...................................................... 37

*United States v. Fronk,*
   606 F.3d 452 (8th Cir. 2010)........................................................ 41

*United States v. Lente,*
   647 F.3d 1021 (10th Cir. 2011).................................................... 37

*United States v. Lynn,*
   592 F.3d 572 (4th Cir. 2010)....................................................... 37

*United States v. Miner,*
   544 F.3d 930 (8th Cir. 2008)....................................................2, 41

*United States v. Miranda,*
   505 F.3d 785 (7th Cir. 2007)....................................................... 37

*United States v. Mothershed,*
   859 F.2d 585 (8th Cir. 1988)....................................................... 35

*United States v. Peters,*
   512 F.3d 787 (6th Cir. 2008)....................................................... 37

*United States v. Roark,*
   924 F.2d 1426 (8th Cir. 1991)..................................................... 35

*United States v. Rodriguez,*
   581 F.3d 775 (8th Cir. 2009)....................................................... 28

*United States v. Street,*
   548 F.3d 618 (8th Cir. 2008)....................................................... 34

*United States v. Urick,*
   431 F.3d 300 (8th Cir. 2005)....................................................... 35

*United States v. Willins,*
   992 F.3d 723 (8th Cir. 2021)....................................................... 28

## FEDERAL STATUTES

18 U.S.C. § 2............................................................................... 1, 4
18 U.S.C. § 844(i)........................................................................ 1, 4
18 U.S.C. § 2101(a)...................................................................... 1, 4
18 U.S.C. § 3553(a).......................................... 2, 18, 20, 38, 39, 41
28 U.S.C. § 1291 ............................................................................. 1
18 U.S.C. § 3231 ............................................................................. 1

## OTHER AUTHORITIES

Fed. R. App. P. 4(b) ....................................................................... 1
Fed. R. Evid. 403 ................................................................... *passim*

# JURISDICTIONAL STATEMENT

The district court in the District of Minnesota convicted Mr. Edwards of riot, in violation of 18 U.S.C. § 2101(a), and arson, in violation of 18 U.S.C. §§ 2 and 844(i), after a jury found Mr. Edwards guilty of both charges. Because the government alleged offenses against the United States in the indictment, the district court had subject-matter jurisdiction under 28 U.S.C. § 3231.

The district court entered judgment on December 29, 2021. R. Doc. 199, at 1. Mr. Edwards timely filed a notice of appeal one day later, on December 30, 2021. R. Doc. 202, at 1; Fed. R. App. P. 4(b).

This Court has jurisdiction over this appeal because the district court's judgment was a "final decision." *See* 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Whether the district court legally erred in failing to conduct the requisite balancing test under Federal Rule of Evidence 403 or alternatively abused its discretion in admitting evidence whose probative value was substantially outweighed by its ample risks of danger under Rule 403. *See* Fed. R. Evid. 403; *United States v. Becht,* 267 F.3d 767, 773 (8th Cir.2001).

2. Whether the court committed substantive procedural error in failing to address defense counsel's specific, nonfrivolous mitigation arguments and imposed a substantively unreasonable sentence. *See* 18 U.S.C. § 3553(a); *Rita v. United States*, 551 U.S. 338, 357 (2007); *United States v. Miner*, 544 F.3d 930, 932 (8th Cir. 2008).

# STATEMENT OF THE CASE

## I.     The night of August 26, 2020.

The summer of 2020 was an especially tense time in Minneapolis.  Months of illness, death, and social isolation caused by the COVID-19 pandemic stressed the city's residents.  The police murder of George Floyd on May 25, 2020, added immensely to that strain.  June brought weeks of riots and looting.  Storefronts across the cities were burned and broken; those that remained intact were boarded up.  A measure of calm was restored in July, but it was short-lived.  By August, commercial centers in downtown Minneapolis were "very tense," with "plywood" covering storefronts and "still a lot of concern by the business district."  Trial Transcript ("TT") 24.

On the night of August 26, 2020, rumors quickly spread throughout the Twin Cities area "that the Minneapolis police had shot and killed" a man in downtown Minneapolis.  TT26.  The rumors were untrue—the man's death was ruled a suicide— but before they were dispelled, roughly a thousand people gathered downtown. TT26–27, 30, 53.  Even after the police released video footage showing that the death was a suicide, the crowds did not disperse; instead, they grew.  TT29–30.  While most of the crowed was simply "milling" about, others were "yelling," "screaming," "shouting," and becoming "agitated."  TT30, 40, 46.

The mayor declared a state of emergency and set a curfew from 8:00 p.m. on the 26th until 6:00 a.m. the following day.  TT34.  Officers and troops from various

law-enforcement agencies arrived downtown to patrol. TT37. Eventually, the crowd moved out of the downtown area around 2:00 a.m. that night (the morning of August 27), but not before significant damage was done. TT40–41. More than seventy buildings downtown were damaged and "dozens of plate glass . . . windows" were broken. TT36, 37. Two fires were set in the Target headquarters building, one in Brit's Pub, and a fourth in another building. TT31.

Authorities surmised that "hundreds" of people "commit[ed] some form of crime downtown" that night. TT53. The federal Alcohol, Tobacco, and Firearms ("ATF") agency asked local law enforcement to "help develop leads towards identifying two" of them. TT56. Surveillance-video and social-media footage led authorities to suspect that one of the two people was Shador Tommie Cortez Jackson, TT62, and the other was Victor Devon Edwards, TT57, 62, 75.

At the ATF's request, police pulled over Mr. Edwards on December 10, 2020. TT98–100. Authorities found two cell phones in Mr. Edwards' car and got warrants to search them both. TT102, 104. Mr. Edwards was arrested and brought to trial on one count of riot and one count of arson. *See* 18 U.S.C. §§ 2, 844(i), 2101(a).

## II.     Mr. Edwards' trial.

At trial, Mr. Edwards' theory of defense as to the arson count was that the government could not prove his identity in the Target surveillance footage of the fire. TT508. His theory of defense as to the riot charge was that he was merely present in

downtown Minneapolis on the night of August 26, 2020, and did not actually commit riot. TT501–04.[1]

### A. The government's case-in-chief.

In its case-in-chief, the government elicited testimony from state and local law enforcement officials to explain the circumstances of the August 26 events and Mr. Edwards' arrest as described above. *See* TT18–105. The government relied primarily on circumstantial phone and video evidence to prove the charges.

### 1. The phone evidence used to prove the riot charge.

The government's phone expert explained that he downloaded data from the two phones that were seized from Mr. Edwards' car. TT120. Information on the phones indicated that they belonged to Mr. Edwards. TT120, 151.

The government introduced evidence from these phones to prove the riot charge against Mr. Edwards. Cell tower data placed both phones in the downtown Minneapolis area that evening. TT142–48. The phone data showed that there were calls between Mr. Edwards' phone and Mr. Jackson's phone that night. TT87. A text message from Mr. Edwards' phone to Mr. Jackson's read, "put me up a purse G, an MK," to which Mr. Jackson responded, "I got you a couple." TT90–91.

Other text exchanges indicated that Mr. Edwards told acquaintances that he was in downtown Minneapolis that night. TT157; *see also* TT161–62. When an

---

[1] The defense did not present evidence and instead rested after the government's case-in-chief. TT481.

acquaintance wrote, "Someone got shot down there [downtown] . . . and they rioting again. Why are you down there," Mr. Edwards responded, "I'm here wit it." TT162. In some messages, Mr. Edwards claimed that he was downtown "lootin[']." TT163, 165. Mr. Edwards received several text messages from individuals asking him to get them merchandise and money, which he said he would do. TT158–59, 161,407, 415.

Mr. Edwards' text messages in the days following August 26 indicated that he did not possess any of the merchandise taken that night; Mr. Jackson or others did. TT93, 414, 417. A selfie-style video taken around midnight on August 27 showed him holding a bundle of cash. TT420–21.

The court instructed the jury that phones and the internet were facilities of interstate commerce, an element of the riot charge. TT518.

## 2. Video evidence depicting events at Saks Off Fifth and near the Ruth's Chris Steakhouse, used to prove the riot charge.

The government also introduced surveillance and bystander video evidence from about 9:30 p.m. to 10:45 p.m. on August 26 to prove the riot charge.

Some soundless municipal surveillance videos depicted Mr. Jackson entering Saks Off Fifth around 9:30 p.m. that night, while Mr. Edwards waited on the sidewalk outside. TT79; *see also* TT238 (case agent explaining that none of the municipal video had sound). Mr. Jackson eventually emerged from the store and handed Mr. Edwards a white plastic bag. TT197–98. A representative from Saks testified that Mr. Jackson took about $2,090 in merchandise. TT315.

At about 10:30 p.m., video footage obtained from social media showed Mr. Jackson and Mr. Edwards near the Ruth's Chris Steakhouse downtown. TT84–85. Mr. Jackson can be seen and heard asking a bystander for a bottle to throw at police, while Mr. Edwards stands by. *Id.* The government's witnesses explained that Mr. Edwards did not confront law enforcement and was not seen acting aggressively or injuring anyone at any point that night. TT96, 179, 428, 430, 433.

Soundless municipal surveillance video shows Mr. Edwards and Mr. Jackson entering a downtown Caribou Coffee shop at 10:45 p.m., after curfew. TT224–26, 238.

### 3. Video evidence of the fire in Target, used to prove the arson charge.

Soundless municipal surveillance video shows Mr. Edwards and Mr. Jackson outside of the Target Headquarters building a few minutes after leaving Caribou Coffee. As explained by the case agent, the video showed Mr. Jackson grabbing a construction sign and "using that sign to violently break into Target through their glass door;" Mr. Edwards later appeared to "walk[] up to his [Mr. Jackson] and . . . help him and hold the sign." TT240.

To piece together what happened next, the government relied on a total of seven different Target surveillance cameras, none of which had sound. TT228–238. An exterior camera showed a group of people, including Mr. Jackson and Mr. Edwards, entering the headquarters building around 10:55 p.m. TT241. Interior

cameras portrayed a darkened building, with lights off.  TT241.  One interior camera

showed several people, including Mr. Jackson and Mr. Edwards, breaking into the

building's mail services center.  TT242–45.  Another camera shows Mr. Edwards walk

into a separate dock area and get locked behind closed doors.  TT248–49, 251.

 While Mr. Edwards was locked in the dock area, a different camera showed

Mr. Jackson "set[ting] a fire on the mailroom desk."  TT252; *see also* TT368.  The

camera showed Mr. Jackson pouring what appeared to be hand sanitizer, an

accelerant, in a trail leading away from the fire.  A fire investigator testified that this

was presumably done to enable the fire "go from one area to another faster."

TT368–69; TT373–74.  Mr. Jackson then attempted unsuccessfully to start a second

fire nearby.  TT257, 371.

 Within a few minutes, the fire investigator testified, the first fire that

Mr. Jackson set was "established," meaning that it was "sustaining flame . . . by itself."

TT377.  After that, cameras showed an individual walk up to the fire, add some small

items to it, and walk away.  TT378.  Another individual then added an item to the fire

as well.  *Id.*

 About two minutes after Mr. Jackson set the first fire, video depicted a "general

area" that the fire investigator testified was "very dark, right, it's not really well

illuminated, you can't make out a lot of things in that area, especially behind that

desktop, it's very shadowy, you can't see what's going on."  TT381.  Visible in that

shadowy scene was a "bright object . . . moving in and around the fire"  in "a

squirting or pouring motion." TT381, 388; *see also* TT263–64. The object appeared to be reflecting the fire's light and in the hand of "just a shadow." TT385. As the object moved around, the fire appeared to grow larger and brighter. TT385.

A fire investigator testified that "whatever" that object was, it "was consistent with a bottle of hand sanitizer." TT394. Alternatively, the fire investigator testified, the bright object could have been a cell phone, but she concluded it was not in part because the object did not illuminate the shadowy figure the way a cell phone would. TT394, 396–97.

Investigators found no empty bottles of hand sanitizer when they arrived the next day, although crews had begun cleaning the area by then. TT395. The ATF fire investigator explained that no combustible gases were detected the next day, but cautioned that hand sanitizers don't "soak in and stick around" that long. TT396. On cross examination, she confirmed that neither she nor the Minneapolis fire investigator collected samples or conducted tests about what accelerants may have been put on the fire. TT398.

The case agent testified that she believed the shadowy figure holding an object over the fire was Mr. Edwards. TT264–65. She testified that tracking and splicing together the seven different surveillance videos showed that Mr. Edwards may have been in that area at that time, as he did not appear in other videos at that moment. TT263; *see also* TT250–266. She testified that the figure's clothing—a black t-shirt

with a white logo, dark cap, light mask—appeared similar to the clothing Mr. Edwards was wearing in other videos.  TT264.

On cross examination, the case agent conceded that the camera directly over the counter on which Mr. Jackson set the fire had been inoperable on August 26. TT435.  The case agent admitted that the image of the shadowy figure (taken from a more distant camera) was unclear, that it was unclear whether that person was holding hand sanitizer, and that it was unclear whether anything was poured on the fire. TT438–42.  The case agent also confirmed that at the time Mr. Jackson set the fire, Mr. Edwards was in a different room, behind locked doors.  TT436.  And she confirmed that there were "gaps between the camera views" that created a "blind spot."  TT441.

Later video showed a group of people that included Mr. Jackson and Mr. Edwards running out onto the street, back into the Target, and back out onto the street again.  TT278, 285–86.  A Target representative testified that the corporation sustained roughly one million dollars in damage that night.  TT328.  The parties stipulated that the Target headquarters building was used in interstate and foreign commerce.  TT330.

### 4.  The Brit's Pub video, a portion of which admitted over Mr. Edwards' Rule 403 objection.

The government sought to offer a video, Government Exhibit 29F, showing Mr. Jackson and Mr. Edwards entering a downtown bar, Brit's Pub, within twenty

minutes of leaving Target. TT214, 294. The video depicts flames emerging from the building about five minutes after Mr. Edwards and Mr. Jackson walked in. TT214–15.

The government also introduced, and the court admitted into evidence, Exhibits 29G and 29H. TT215, 294. Both Exhibit 29G and Exhibit 29H were excerpts of Exhibit 29F that depicted only Mr. Edwards entering Brit's Pub. TT215. The government explained that it did not intend to play Exhibits 29G and 29H for the jury; it only intended to play clips from Exhibit 29F. *Id.*

On the morning of the second day of trial, outside of the jury's presence, Mr. Edwards objected to Government Exhibit 29F under Federal Rule of Evidence 403, arguing that the evidence was prejudicial, misleading, and cumulative, and that it confused the issues. TT215–16, 17. Mr. Edwards argued that "any kind of footage of Mr. Edwards being a part of another separate alleged fire . . . confuses the issue and is unfairly prejudic[ial] because it[] . . . show[s] the jury that he was involved with another fire" beyond the Target fire charged in the arson count. TT217, 219. Defense counsel proposed admitting only those portions of the video that showed Mr. Edwards entering the pub but "cut[ting] it off before the fire." TT219; *cf.* TT215 (prosecutor explaining that the two excerpted videos, Government Exhibits 29G and 29H, showed this limited evidence).

The government acknowledged that the "riot charge is broad and compasses [Mr. Edwards] entire course of conduct downtown that evening," including the

extensive, previously admitted video evidence of Mr. Edwards at Saks, Caribou, Ruth's Chris Steakhouse, and Target, and the phone evidence suggesting looting activity. TT216–17. The government further acknowledged that the Brit's Pub fire evidence was merely circumstantial support of previously admitted riot evidence. TT217. Nonetheless, the government claimed that the video footage of the fire in Brit's Pub fire was "absolutely integral to proving the riot charge." *Id.*

The court made a tentative ruling that the evidence "[i]s likely to be admissible as part of the crime charged . . . in Count 1, if not to elucidate the circumstances surrounding the crimes charged." TT219–20.

In the jury's presence later that day, the government elicited testimony from its case agent that the Brit's Pub video evidence was "relevant" and had "material evidentiary value" because it showed "another business that the defendant and his friend entered into after the curfew when it was closed during the rioting that was going on." TT292–93. The government then formally offered Government Exhibit 29F into evidence. TT294.

Defense counsel raised anew the Rule 403 objection. TT294. The court overruled the objection, reasoning that:

> The travel of the defendant throughout that night is relevant evidence of the crimes charged. The defendant is charged with riot and arson and if the defendant was engaged in almost simultaneous in the sense that it happened immediately after what we've seen about the Target Headquarters, further instances of what could be considered riotous behavior that is relevant what has to be proof for Count 1 [*sic*].

TT294–95.  The court reiterated that Exhibit 29F "is . . . relevant on Count 1 and is also further evidence of identity, which I understand to be one of the primary defenses in this case."  TT295.

The court gave a limiting instruction to the jury.  The court explained that the video would "show the defendant entering into Brit's Pub and that there is a fire thereafter in Brit's Pub."  TT296.  The court instructed that "the government is offering this evidence not as evidence of Count 2, which is arson, but rather as part of its poof on Count 1, which is the charge of riot."  *Id.*

The government then played selected portions of the fifteen-minute video identified as Government Exhibit 29F.  The video showed that after leaving Target, Mr. Jackson walked by the downtown Caribou Coffee shop.  TT298.  A few minutes later, Mr. Edwards walked past the same area and toward Brit's Pub while talking on his cell phone.  TT299; *see also* TT416 (case agent explaining that call logs from this time suggest that Mr. Jackson called Mr. Edwards at this time).

When Mr. Edwards arrived at Brit's Pub, Mr. Jackson walked out of the pub. He and Mr. Edwards meet outside, then walk back into the pub together.  TT300. Other individuals entered and exited the pub as well.  TT301.  The agent confirmed that there was no surveillance footage from inside the pub.  TT300–01.

The prosecutor then paused the video and asked the case agent what was "important" and "significan[t]" about the video.  TT301.  The case agent explained that "almost immediately after Target Headquarters" and while the curfew was still in

place, Mr. Edwards and Mr. Jackson "enter[ed] into another business that was closed." *Id.*

The case agent also explained that what she found "important" and "significan[t]" in the video was that "after the defendant and his friend walk into Brit's Pub, approximately five minutes later, we're able to see flames on this camera coming outside of Brit's Pub." TT301. The case agent previewed for the jury that a later portion of the video showed "very small flickers coming out of one of the windows. That fire then grows in intens[ity], the flames continue to grow, and you'll see Brit's Pub on fire." TT302.

After the case agent previewed and highlighted the significance of the Brit's fire footage, the government "skip[ped] ahead about five minutes" to a later portion of the video depicting the flames the case agent described. TT301–02. The prosecutor then paused the video, asking the case agent, "does anything else significant happen in this video?" TT302. The case agent explained that "the video continues to show the fire inside of Brit's Pub growing in size and intensity." T302.

The prosecutor "skip[ped] ahead" again in the video. TT302. She asked the agent to confirm "see[ing] the fire at Brit's Pub" in the video. *Id.*

The case agent testified that the last part of the video showed two figures whom she believed to be Mr. Edwards and Mr. Jackson standing by their vehicles near the Caribou Coffee and then driving away. TT302–03, 305.

The fire investigator confirmed that the Target Headquarters fire and the Brit's Pub fire were two of the "larger fires" that occurred that night. TT334.

**B. Closing arguments.**

The prosecutor began his closing argument: "Fuel to the fire. At bottom, that's what this case is about both literally and figuratively." TT481. He argued that "Victor Devon Edwards[] came to take advantage of a volatile situation, to add fuel to the fire; didn't come for justice, came for money, came to loot, came to burn, and came to join in the mayhem. And for three hours, the defendant was downtown adding fuel to the fires." TT482.

The prosecutor reviewed the timeline of events leading to the mailroom fire that Mr. Jackson had set. TT482–84. He conceded that the video of the mailroom "is dark" and that "you can't see much more than a shadow walking behind the desk of the fire." TT488. But he argued that the jury could conclude that the shadow was Mr. Edwards based on the shadowy figure's clothing and the fact that Mr. Edwards does not appear in other video footage from elsewhere in the building. TT488, 489. The prosecutor then argued that a few minutes after leaving Target, Mr. Edwards and Mr. Jackson "entered Brit's and laid waste to it resulting in Brit's being set on fire." TT491.

The prosecutor argued that the evidence proved all three elements of the riot charge (count 1) beyond a reasonable doubt.: that Mr. Edwards used his phone and the internet, both of which are facilities of interstate commerce, that he intended to

participate in a public disturbance, and that he took overt actions to join in the public disturbance or help another do so.  TT493–96.

The prosecutor also argued that the evidence proved the arson charge (count 2).  The prosecutor told the jury, "your starting point is going to be the video of the defendant behind the fire."  TT498.  The prosecutor then argued that "the evidence tells you . . . [that] from the looting at Saks to the joining in the ransacking, Caribous, to literally joining in the breaking down of the door of Target, the defendant's entire purpose this night has been to loot and to cause mayhem."  TT499.

Defense counsel argued in closing that the government had failed to prove either charge.  As to riot, defense counsel argued that Mr. Edwards "was just merely present while other people were doing mischief.  He was a member of the crowd and he got up or he got caught up in it, and for that he's not guilty of riot."  TT504.  As to arson, defense counsel argued that the government had not proven beyond a reasonable doubt that "the blob on the video is him."  TT504-508.

The prosecutor argued in rebuttal that the jury should "try not to get tunnel vision [on the arson charge].  By 'tunnel vision' I mean focusing solely on one piece of evidence in the case and asking does this one piece of evidence tell me everything I know and everything I need to know about this case?"  TT509.  The government conceded that the video of the shadowy figure behind the fire in the Target mailroom does not "tell you everything."  *Id.*  But the prosecutor urged the jury to "look at all of . . . the evidence[,] not just the appearance, but what's happening behind that counter

16

with the entire purpose of defendant's night being to damage, destroy, loot, cause mayhem, and return the only verdict that's consistent with that evidence and that's guilty on Count 2." TT511-12.

### C. Verdict.

The court read the jury its final instructions and excused the jury to deliberate. TT512–525. The jury returned a verdict of guilty on both counts. TT527.

## III. Mr. Edwards' sentencing.

### A. The pre-sentence report and government recommendation.

The probation officer prepared a presentence report recommending a Guidelines calculation for the offense. For Count 1, the probation officer recommended a baseline offense level of 12, under U.S.S.G. § 2B2.1(a)(2). PSR ¶ 34. The probation officer recommended adding a two-level enhancement based on the amount of loss, under U.S.S.G. § 2B1.1(b)(2)(C), for an adjusted offense level of 14. PSR ¶¶ 35, 39. For Count 2, the probation officer recommended a base offense level of 24, under U.S.S.G. § 2K1.4(a)(1). As no specific offense characteristics or adjustments applied, the adjusted offense level remained 24. PSR ¶ 45. The probation officer then applied the higher of the two adjusted offense levels for a total offense level of 24. PSR ¶¶ 47, 51. The probation officer calculated a criminal history category of VI. PSR ¶ 76. Based on a total offense level of 24 and a criminal history category of VI, the probation officer calculated a Guidelines range of 100 to 125

months.  PSR123.  The probation officer acknowledged that 60 months (five years) was the maximum sentence that the statute allowed for Count 1.  PSR ¶ 122.

The government similarly calculated a total offense level of 24, a criminal history category VI, and a Guidelines range of 100 to 125 months.  R. Doc. 196, at 6. The government recommended a sentence of 100 months.  *Id.*

### B. Mr. Edwards' recommendation.

Defense counsel filed a sentencing memorandum agreeing with probation's initial Guidelines calculation of 100 to 125 months but arguing that several departure provisions applied.  R. Doc. 194, at 4, 8 – 9 (citing U.S.S.G. §§ 5H1.3, 5H1.4, 5K2.0(c)).  Alternatively, defense counsel argued that the sentencing factors under 18 U.S.C. § 3553(a) warranted a downward variance to sixty months—the statutory maximum for Count 1 and the statutory minimum for Count 2.  *Id.* at 10.  Specifically, defense counsel explained that a downward variance was necessary to avoid unwarranted sentencing disparities with Mr. Jackson—who had received a thirty-three-month sentence upon pleading guilty a few months before—based on the nature and circumstances of the offense and the history and characteristics of the defendants.  *Id.* at 10–12.

As to Mr. Edwards' history and characteristics, defense counsel explained that Mr. Edwards was a young father with no history of violence.  R. Doc. 194, at 3–5.  He is a survivor of abuse and trauma and has struggled with learning disabilities, debilitating anxiety, and a seizure disorder.  R. Doc. 194, at 3–4.  Like many

individuals lacking support and resources, Mr. Edwards turned to marijuana and alcohol at a young age to help cope with his disabilities and past trauma. R. Doc. 194, at 4–5. This led to a pattern of low-level arrests—many of which were related to marijuana-usage—followed by long stretches of law-abiding behavior where Mr. Edwards focused love and attention on his large family. *Id.*

When he was 29 years old, Mr. Edwards experienced the tragic, accidental death of his toddler son due to a bowel obstruction. R. Doc. 194, at 5–6. Mr. Edwards fell into a profound depression. R. Doc. 194, at 6. He was suicidal. *Id.* He began drinking and engaging in addictive behaviors. *Id.* He remained conviction-free for two years, but he felt self-destructive and was in a deeply negative place by the summer of 2020. *Id.*

As to the nature and circumstances of the offense, defense counsel noted that trial evidence showed Mr. Jackson spearheading actions on the night of August 26, 2020. R. Doc. 194, at 7, 12. Mr. Jackson broke into Saks Off Fifth and removed cash and merchandise from the store, while Mr. Edwards stood on the sidewalk. Mr. Jackson looked for a glass bottle to throw at police, while Mr. Edwards stood by and never confronted law enforcement. Mr. Jackson lit the fire in the Target mailroom, poured accelerant in a trail leading from it, and tried to light a second fire, while the evidence of whether Mr. Edwards added anything to the fire was disputed. *Id.*

Mr. Jackson received a sentence of thirty-three months. R. Doc. 194, at 12. Defense counsel acknowledged that Mr. Jackson reaped a sentencing benefit for pleading guilty, whereas Mr. Edwards' Guidelines range reflected the fact that he went to trial and has significant criminal history. *Id.* But counsel argued that imposing a sixty-month sentence upon Mr. Edwards—a sentence two years more than what Mr. Jackson received—would be more than sufficient to reflect these differences. Anything greater, counsel argued, would create unwarranted disparities that failed to reflect the nature and circumstances of the offense or the history and characteristics of the defendants. *Id.* at 10–12 (citing 18 U.S.C. § 3553(a)).

## C. The sentencing hearing.

At sentencing, the district court calculated the Guidelines consistent with probation's and the parties' calculations: a total offense level of 24, criminal history category of VI, and a range of 100 to 125 months. Sentencing Transcript ("ST") 4.

The court acknowledged that Mr. Edwards "suffers from serious mental illness, which likely stems, at least in part, from being a[b]used as a child and the tragic death of his son in 2018." ST6. But the court denied defense counsel's request for a downward departure. ST6–7. The court then invited defense counsel's allocution with respect to the § 3553(a) factors. ST7.

Defense counsel reiterated that Mr. Jackson had received a thirty-three-month sentence based in part on the mitigating circumstances of his mental health, substance abuse, and "difficult" childhood. ST8–9. On the other hand, Mr. Jackson also been

the instigator and had taken the lead in breaking into Target and lighting a fire inside. ST9.

Defense counsel acknowledged that Mr. Edwards faced a higher Guidelines range because he had exercised his constitutional rights to go to trial and to remain silent. ST10. And defense counsel acknowledged that the government was "within rights to make Mr. Edwards pay a penalty for that[,] and they did in a couple of ways." ST10. The government filed a superseding indictment charging Mr. Edwards with arson, whereas Mr. Jackson pled to an arson conspiracy charge. ST10.

Defense counsel explained that the superseding indictment the government filed after Mr. Edwards exercised his constitutional rights carried two significant ramifications. First, it raised the statutory minimum sentence to five years, where the arson conspiracy that Mr. Jackson pled to carried a five-year statutory maximum. ST10. Second, it heightened the Guidelines base offense level: Mr. Edwards faced a base offense level of 24 for arson, whereas Mr. Jackson faced a base offense level of 20 for arson conspiracy. ST10. Beyond that, Mr. Jackson received the benefit of a three-level acceptance of responsibility for pleading guilty; Mr. Edwards, because he went to trial, received no such reduction. ST10. Defense counsel explained that Mr. Edwards had thus paid a hefty trial tax that was reflected in the statutory minimum sentence and advisory Guidelines range.

Defense counsel contended that a sentence of sixty months—nearly double what Mr. Jackson received—would be sufficient but not greater than necessary.

ST11.  Defense counsel explained that Mr. Edwards had similar, if not more,

mitigating circumstances to Mr. Jackson, which included childhood sexual abuse and

the recent death of his toddler son.  ST11.  At the same time, defense counsel

explained, Mr. Jackson's offense conduct was more aggravated than that of

Mr. Edwards, as he lit the fire, broke into more buildings, took more merchandise,

and harassed police.  ST11.  Counsel argued that a sentence that was nearly double

Mr. Jackson's would appropriately reflect the procedural differences in their cases and

Mr. Edwards' higher criminal history category.  ST11.  But a sentence that more than

doubled Mr. Jackson's would create unwarranted sentencing disparities given both

men's history and characteristics and the nature and circumstances of the offense.

ST11.

        The prosecutor argued for a 100-month sentence, describing Mr. Edwards'

offense conduct based on the government's view of the trial evidence.  ST12–14.  The

prosecutor did not respond to defense counsel's points about the more serious

charges in the superseding indictment and the steeper statutory penalties and

Guidelines range Mr. Edwards faced by going to trial.  Instead, the prosecutor

suggested that Mr. Edwards' decision to go to trial was an independently aggravating

factor at sentencing:  "aggravating his serious crimes, to this day the defendant

[Mr. Edwards] continues to exhibit no remorse, no regret.  He has not apologized,

even once."  ST13–14

Regarding the unwarranted-disparity argument, the prosecutor asserted without explanation that Mr. Edwards' "conduct in this case was certainly as culpable, not lesser, than that of his co-defendants, including Mr. Jackson." ST16.[2] And the prosecutor again emphasized her view that Mr. Edwards' decision to go to trial was an aggravating factor: "unlike his co-defendants who immediately accepted responsibility, exhibited genuine remorse for their actions, and entered guilty pleas very early in the investigation, the defendant steadfastly denied any culpability, refused repeated plea offers to charges with lesser sentences, and has continued to exhibit no remorse for any of his actions." ST16; *see also id.* (prosecutor reiterating that Mr. Edwards "exhibited no remorse or accountability for his actions."). The prosecutor further noted that Mr. Edwards "fought detention repeatedly." ST16.[3]

The court imposed concurrent sentences of 100 months on Count 2 and 60 months on Count 1, followed by two years of supervised release. ST18, 19. In explaining its sentence, the court pointed to some aggravating factors and some mitigating factors.

Among the aggravating factors, the court found that Mr. Edwards had "acted as a look-out for his friend, Mr. Jackson, so that Mr. Jackson could help loot the

---

[2] A third co-defendant, Leroy Williams, pleaded guilty on the same arson-conspiracy charge as Mr. Jackson but has not been sentenced.

[3] The district court docket reflects that Mr. Edwards opposed the government's initial motion for detention, R. Doc. 3, and later moved for reconsideration of pre-trial release on conditions, R. Doc. 90.

store." ST23.  The court stated that when "Mr. Jackson yelled for a bottle to throw at law enforcement," "Mr. Edwards stood nearby [and] . . . did nothing to dissuade Mr. Jackson from throwing the bottle at the officers." ST23–24.  The court stated that Mr. Edwards "helped to break into the building and in its mailroom." ST24. And "after Mr. Jackson set a small fire on a counter in the mailroom, Mr. Edwards poured a bottle of hand sanitizer on the fire to help it grow." ST24.  The court stated both defendants' actions caused extensive damage." ST24.  The court also reasoned that Mr. Edwards had not shown remorse for his offense and had a significant criminal record.  ST26.

As mitigating factors, the court determined that Mr. Edwards has "shown an ability to live a law-abiding life for sustained periods of time." ST26.  And "his crimes have mostly consisted of stealing, selling drugs, and driving while impaired." ST27. The courted recognized that "Mr. Edwards clearly struggles with mental illness which, as I have mentioned, is likely related to the abuse he suffered as a child and to the tragic loss of his son" and "no doubt" contributed to his "bad decisions." ST27.  The court also acknowledged the harsh lockdown measures that Mr. Edwards experienced during his year of pre-trial custody due to COVID restrictions.  ST27.  And the court finally acknowledged that Mr. Edwards "provide[s] a great deal of emotional support" to his children and that "his family members express great love for him and great appreciation for the role that he played in their lives." ST27.

The court stated that it believed the disparity between Mr. Jackson's and Mr. Edwards' sentences was not "unfair" for three reasons. ST27–28. First, Mr. Edwards had more significant criminal history. ST28. Second, Mr. Jackson had more significant childhood trauma and more severe mental illness. ST28. And third "and, most importantly, Mr. Jackson accepted full responsibility for his actions and did so promptly." The court noted that it was sentencing Mr. Edwards to the low end of his Guidelines range while Mr. Jackson received a sentence in the middle of his Guidelines range. ST28.

This appeal follows.

## SUMMARY OF THE ARGUMENT

This Court should vacate Mr. Edwards' conviction because the district court legally erred in its analysis of Federal Rule of Evidence 403. Defense counsel objected to the video footage of the Brit's Pub fire in Government Exhibit 29F and explained that the unfair prejudice, confusion, misleading nature, and cumulativeness of that footage outweighed is probative value. Defense counsel suggested that showing footage only of Mr. Edwards entering Brits' Pub after curfew, without the fire footage, would be an adequate substitute. The court was required to conduct a balancing test, weighing the stated dangers of the fire footage against its probative value. The court also was required to conduct a balancing test of the proposed

substitute evidence. It did neither. Instead, the court determined only that the fire footage was relevant, and admitted it. This was reversible legal error.

The court also abused its discretion in admitting the evidence. The dangers of the fire footage substantially outweighed its probative value. The fire footage was highly unfairly prejudicial, confusing, and misleading because the jury likely would believe it supported the arson charge in Count 1. It also was unduly cumulative because the government had introduced ample other evidence of riot in its case-in-chief. The fire footage had limited probative value because it did not depict how the fire started or when Mr. Edwards left the building. Other available evidence—namely Government Exhibits 29G and 29H, which the government elected not to play for the jury—showed Mr. Edwards entering Brit's Pub but did not include the fire footage. This evidence would have avoided the dangers presented by Exhibit 29F.

Because the district court legally erred in its Rule 403 analysis and abused its discretion in admitting the Brit's fire footage, this Court should reverse. The government cannot prove that the error was harmless because its arson case was weak and the court's limiting instruction only further confused the issues. A new trial is warranted.

Alternatively, this Court should reverse Mr. Edwards' sentence because the district court committed significant procedural error in failing to respond to defense counsel's non-frivolous mitigation arguments. Defense counsel argued that sentencing Mr. Edwards greater than sixty months would create an unwarranted

disparity with Mr. Jackson's sentence. Counsel gave specific, non-frivolous reasons supporting her argument, including Mr. Edwards' and Mr. Jackson's respective conduct in the offense and their respective history and characteristics. Each of these reasons was tethered to a sentencing factor that the court was required to consider.

The court failed to adequately address defense counsel's arguments. For example, the court never responded to Mr. Edwards' arguments that an unwarranted disparity would exist because Mr. Jackson had more culpable conduct that night because he (unlike Mr. Edwards) entered buildings to take merchandise, lit fires, and sought to assault police. Moreover, the court never responded to Mr. Edwards' arguments that an unwarranted disparity would exist because Mr. Edwards' chidlhood sexual abuse and recent family loss made his history and characteristics as mitigated as Mr. Jackson's. Instead, the court cherry-picked aggravating factors for Mr. Edwards and mitigating factors for Mr. Jackson and concluded that the sentencing disparity was warranted.

The court procedurally erred in imposing sentence without addressing Mr. Edwards' nonfrivolous mitigation arguments. This Court should therefore vacate the judgment and remand for resentencing with instruction to the district court to respond to all non-frivolous mitigation arguments.

I.   **The district court erred by admitting evidence of the Brit's Pub fire over Mr. Edwards' Rule 403 objection.**

   **A. Standard of review.**

   This Court reviews constitutional challenges and a district court's interpretation and application of the rules of evidence *de novo*. *United States v. Rodriguez*, 581 F.3d 775, 796 (8th Cir. 2009); *United States v. Willins*, 992 F.3d 723, 726 (8th Cir. 2021). This Court reviews the factual findings supporting a district court's evidentiary ruling for an abuse of discretion. *Willins*, 992 F.3d at 726.

   As explained below, the district court legally erred in its interpretation and application of Rule 403, an error this Court should review *de novo*. The district court also abused its discretion in admitting the fire footage. The government cannot prove that these errors were harmless.

   **B. The district court misinterpreted Rule 403 by failing to conduct the required balancing test.**

   Federal Rule of Evidence 403 allows a district court to exclude evidence when the danger that the evidence may cause unfair prejudice, confuse the issues, mislead the jury, or needlessly present cumulative evidence substantially outweighs its probative value. The Supreme Court has advised that Rule 403 requires the opponent of the evidence to make a preliminary showing of danger. *Old Chief v. United States*, 519 U.S. 172, 182 (1997). Upon that showing, the court must "evaluate the degrees of probative value and unfair prejudice [or other danger] not only for the item in

question but for any actually available substitute as well." *Id.*; *see also United States v. Becht,* 267 F.3d 767, 773 (8th Cir.2001); *United States v. Betcher*, 534 F.3d 820, 825 (8th Cir. 2008).

Proper application of this balancing test "should always result in the exclusion of evidence that is so prejudicial that it violates a defendant's due process right to a fair trial." *United States v. Coutentos*, 651 F.3d 809, 819 (8th Cir. 2011) (internal quotation marks and citation omitted). And when there is even a *risk* of unfair prejudice, the Supreme Court teaches that district courts should discount the probative value of the disputed evidence if an evidentiary alternative has equal or greater probative value. *Old Chief*, 519 U.S. at 182–83; *see also Becht,* 267 F.3d at 773.

Here, the district court legally erred in its interpretation and application of Rule 403 by failing to conduct the requisite balancing test. Citing Rule 403, defense counsel argued that "any kind of footage of Mr. Edwards being a part of another separate alleged fire . . . confuses the issue and is unfairly prejudic[ial] because it[] . . . show[s] the jury that he was involved with another fire" beyond the Target fire charged in the arson count. TT217, 219; *see also* TT294. Counsel also argued that the fire footage was misleading and unduly cumulative. TT215. Defense counsel thus made a preliminary showing of the fire footage's Rule 403 dangers. *See Old Chief*, 419 U.S. at 182.

Defense counsel then proposed an alternative: admitting only those portions of the video showing Mr. Edwards entering the pub but "cut[ting] it off before the

fire." TT219. Indeed, the government had offered two video exhibits (Government Exhibits 29G and 29H) that were excerpts of Exhibit 29F and showed only Mr. Edwards entering Brit's Pub after curfew. TT215. Alternatively, Exhibit 29F could have been edited to exclude the fire footage, as defense counsel proposed. TT219.

Having received defense counsel's objection and proposed substitute evidence, the court was required to:

- evaluate the degree of probative value of the Brit's fire footage;

- evaluated the degree of Rule 403 dangers of the Brit's fire footage;

- evaluate the degree of probative value of a video showing only Mr. Edwards entering Brit's after curfew, without the fire footage; and

- evaluate the degree of Rule 403 dangers of a video showing only Mr. Edwards entering Brit's after curfew, without the fire footage.

*See Old Chief*, 419 U.S. at 182 (stating that court must "evaluate the degrees of probative value and unfair prejudice not only for the item in question but for any actually available substitute as well.").

The court did none of these things. Nowhere in its analysis is there consideration of how probative the fire footage was of the riot charge, how prejudicial, confusing, misleading, or cumulative it may have been considering the separate arson charge and other riot evidence, how probative any video without the fire footage would be of the riot charge, and how dangerous (under Rule 403 terms) any such video would be.

Instead, the court simply made a relevancy ruling about the fire footage:

> The travel of the defendant throughout that night is relevant evidence of the crimes charged. The defendant is charged with riot and arson and if the defendant was engaged in almost simultaneous in the sense that it happened immediately after what we've seen about the Target Headquarters, further instances of what could be considered riotous behavior that is relevant what has to be proof for Count 1 [*sic*].

TT294–95. Had defense counsel objected to the video under Rule 401, this ruling may have been apt. But relevancy was not the basis of the objection, Rule 403 was. TT215–19, 294. The court's relevancy analysis was thus misplaced.

The court's relevancy ruling on defense counsel's Rule 403 objection, its absence of any balancing test, and its failure to consider the evidentiary substitutes shows that it misinterpreted and misapplied Rule 403. As explained below, under a proper analysis, the evidence should have been excluded. This Court, reviewing de novo, should hold that the district court thus legally erred.

### C. The district court abused its discretion in admitting the Brit's fire footage.

Proper application of Rule 403 shows that the Brit's fire footage should have been excluded under Rule 403. In admitting the evidence, the court abused its discretion.

The fire footage had limited probative value. The government acknowledged that the "riot charge is broad and compasses [Mr. Edwards] entire course of conduct downtown that evening," including extensive, previously admitted evidence showing Mr. Edwards at Saks, Caribou, Ruth's Chris Steakhouse, and Target. TT216–17. The

government further acknowledged that the fire footage was merely circumstantial support of previously admitted riot evidence. TT217. There was no footage from inside Brit's Pub that would have shown when and how the fire was lit. TT300–01. Nor was their video evidence of when or how Mr. Edwards exited the building. The fire footage thus had limited probative value.

At the same time, the fire footage was unfairly prejudicial and misleading, confused the issues, and was unduly cumulative. As the government emphasized, Mr. Edwards entered Brit's soon after leaving Target, and he was joined by Mr. Jackson, who the government showed had lit the fire in Target. The footage showed flames in the pub five minutes later, and the government "skipped" through the footage to show the jury this turn of events in quickened order. TT301–02. This was misleading, unduly confusing, and unfairly prejudicial. It demonstrates that the government attempted to tie Mr. Edwards' guilt on the Target arson to his association with the Brit's Pub fire. Indeed, even the court, in considering defense counsel's objection, conflated the riot and arson charges and acknowledged that the fire footage was relevant to both. TT219–20, 294–95.

A workable alternative, as defense counsel suggested, would have been to show footage only of Mr. Edwards entering Brit's Pub, without the fire footage. Although arguably cumulative, this limited footage would have supported the government's riot charge without implicating the arson charge. In other words, any probative value of this evidence would not have been substantially outweighed by any Rule 403 dangers.

In short, the fire footage did not advance the government's case on the riot charge; it only added to the government's arson case in a manner that was misleading, confusing, and unfairly prejudicial to such a degree that it implicated Mr. Edwards' due-process rights. *See Coutentos*, 651 F.3d at 819. At a minimum, there was a sufficient risk of unfair prejudice and other Rule 403 dangers that the district court should have discounted its probative value and instead admitted only the video clips that excised the fire footage. The court's failure to do was legal error and an abuse of discretion.

**D. The government cannot prove that the error was harmless.**

"An evidentiary error is harmless 'if, after reviewing the entire record, [this Court] determine[s] that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict.'" *United States v. Crenshaw*, 359 F.3d 977, 1003–04 (8th Cir. 2004) (quoting *United States v. Carroll*, 207 F.3d 465, 470 (8th Cir. 2000)). "In determining whether an evidentiary error was harmless, [this Court] must consider the effect of the improper evidence in the overall context of the government's case." *Id.* at 1004.

Here, the overall context of the government's case was that the Target arson evidence was spotty and weak. The government went to great lengths to try to prove that the indistinct blob holding a shiny object above the fire was Mr. Edwards. It spliced videos. It zoomed in. It emphasized the footage in which Mr. Edwards did *not* appear. TT263; *see also* TT250–266.; *cf.* TT441 (defense on cross-examination

eliciting testimony that there gaps in the surveillance-camera coverage, areas of the building that the cameras could not see).  It elicited conflicting testimony that, on the one hand, the object in hand was likely not a cell phone because it did not illuminate the figure, and, on the other hand, that there was enough light by which to see the figure.  TT394, 396–97.  But in the end, even the prosecutors conceded that the image was not clear.  TT488.  The arson case was, in short, not a strong one.

The government relied on the Brit's fire footage to prop up this weak evidence. The government exploited similarities between the circumstances of the Target fire and the circumstances of the Brit's fire.  In both cases, Mr. Jackson was in the building first.  Then Mr. Edwards joined.  Then flames appeared and grew.  The government exploited the closeness in time of the Brit's and Target fires and argued their temporal proximity in closing.  TT301, 491.  The government elicited testimony from several witnesses about how the Brit's and Target fires were the two largest fires that occurred that evening.  TT334.  In closing arguments, the prosecutor emphasized the "fires," plural, that occurred that night.  TT482.  And he explicitly urged the jury to consider the riot evidence to support the arson charge.  TT491, 499.

Moreover, the district court's limiting instruction only exacerbated the confusing nature of the fire footage and did not mitigate the risks of danger that the evidence presented.  *See United States v. Street*, 548 F.3d 618, 629 (8th Cir. 2008) (holding that this Court "must evaluate 'whether a curative instruction as sufficient in the context of the entire trial, and weigh the prejudice against the strength of the

government's evidence.'") (quoting *United States v. Urick*, 431 F.3d 300, 304 (8th Cir. 2005)). "A bell once rung is difficult to unring." *United States v. Roark*, 924 F.2d 1426, 1433 (8th Cir. 1991). Quoting Justice Brennan's opinion in *Bruton v. United States*, 391 U.S. 123, 135 (1968), this Court in Roark emphasized that "'there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.'" *Roark*, 924 F.2d at 1434.

This is such a case. The court gave its limiting instruction before the government played the fire footage—before the jury ever saw it. TT296. The limiting instruction repeatedly referenced both the riot and arson charges together, thus further confusing the issues. The court never repeated the limiting instruction after the jury saw the footage, in its final instructions, or during the government's closing arguments, when the government repeatedly referenced the "fires" and explicitly referenced the riot evidence to prove the arson charge. The jury thus could not be expected to separate out the very issues that the court and government themselves confused. *See United States v. Mothershed*, 859 F.2d 585, 591–92 (8th Cir. 1988) (reversing where district court erroneously admitted evidence despite repeated limiting instructions from the court).

Reviewing this record in its entirety, the government cannot establish that the fire footage had only a slight influence on the verdict. *Crenshaw*, 359 F.3d at 1003–04. This Court should therefore reverse and remand this case for a new trial.

### III. The district court committed significant procedural error by failing to address defense counsel's arguments at sentencing.

#### A. Standard of review.

When this Court reviews a challenge to a sentence, it "must first ensure that the district court committed no significant procedural error." *United States v. Fisher*, 861 F.3d 802, 804 (8th Cir. 2017) (internal quotation marks and citation omitted). Significant procedural errors including failing properly calculate the Guidelines, *see Gall v. United States*, 552 U.S. 38, 51 (2007), failure to adequately explain the sentence, *see id.*, and failure to address non-frivolous mitigation arguments, *see Rita v. United States*, 551 U.S. 338, 357 (2007). *See also United States v. Feemster*, 572 F.3d 455, 561 (8th Cir. 2009) (en banc). This Court reviews Guideline-calculation-error claims *de novo*. It thus stands to reason that other procedural errors, including failing to address non-frivolous mitigation arguments, also are reviewed *de novo*. *See United States v. French*, 719 F.3d 1002, 1007 (8th Cir. 2013). This Court reviews a sentencing court's factual findings for clear error. *Id.* This Court reviews challenges to the substantive reasonableness of a sentence for an abuse of discretion. *United States v. Clay,* 622 F.3d 892,895 (8th Cir. 2010).

#### B. The district court failed to adequately address defense counsel's arguments regarding unwarranted sentencing disparities.

The district court committed significant procedural error when it imposed a 100-month sentence without addressing any Mr. Edwards' key arguments regarding the unwarranted disparity such a sentence would create with his co-defendant's

sentence.  The court's error was contrary to the Supreme Court authority and numerous circuit court opinions.  *See Rita*, 551 U.S. at 357.[4]  The error likely led the court to impose a harsher sentence than it otherwise would have.  And it deprived this Court of the ability to meaningfully review the substantive sentence.  This Court should therefore reverse.

The Supreme Court in *Rita* instructed that "where the defendant or prosecutor presents non-frivolous reasons for imposing a different sentence . . . the judge will normally go further and explain why he has rejected those arguments."  551 U.S. at 357.  To satisfy *Rita*'s responsive-explanation rule, a district court's silent *consideration* of a non-frivolous sentencing argument is not enough.  Instead, a district court must *explain* its sentence in reference to the defendant's argument.  In other words, the

---

[4] *See also United States v. Bigley*, 786 F.3d 11, 13 (D.C. Cir. 2015) (per curiam) (holding that district court's failure to consider defendant's nonfrivolous sentencing arguments was plain error); *United States v. Friedman*, 658 F.3d 342, 350–52 (3d Cir. 2011) (holding that district court's failure to address unwarranted disparities argument was procedural error requiring reversal); *United States v. Lynn*, 592 F.3d 572, 575 (4th Cir. 2010) (holding that district court committed procedural error because it failed to address defendant's nonfrivolous reasons for imposing a below-Guidelines sentence); *United States v. Peters*, 512 F.3d 787, 788 (6th Cir. 2008) (reversing because the district court never addressed the defendant's arguments for a time-served sentence); *United States v. Miranda*, 505 F.3d 785, 790 (7th Cir. 2007) (holding that the district court procedurally erred in failing to respond to defendant's argument for a below-Guidelines sentence); *United States v. Lente*, 647 F.3d 1021, 1026–30 (10th Cir. 2011) (reversing where district court did not respond to the defendant's argument, based on Sentencing Commission data, that the government's suggested sentence would create sentencing disparities).

court must explicitly address a defendant's non-frivolous mitigation arguments when it imposes sentence.

Here, defense counsel made several specific, non-frivolous arguments explaining why a 100-month sentence would create unwarranted disparities with Mr. Jackson's sentence. R. Doc. 194, at 7, 10–12; ST8–11. Counsel tethered her arguments to sentencing factors that the district court was required to consider.

For example, counsel made several arguments tied to "the nature and circumstances of the offense." *See* 18 U.S.C. § 3553(a)(1) (sentencing court "shall consider . . . the nature and circumstances of the offense"). Counsel explained that Mr. Jackson had more culpable conduct than Mr. Edwards. ST9, 11. Mr. Jackson broke into the stores. Mr. Jackson lit the fires. Mr. Jackson took the merchandise. And Mr. Jackson held onto the merchandise afterwards.

With respect to Mr. Edwards' "history and characteristics," counsel informed the court of Mr. Edwards' unique tragedy of losing his toddler son as well as the trauma and sexual abuse that he experienced as a child. R. Doc. 194 at 5–6; *see also* 18 U.S.C. § 3553(a)(1) (sentencing court "shall consider . . . the history and characteristics of the defendant").

Counsel tied these arguments tied to the sentencing factors requiring a court to consider the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a)(6). Specifically, counsel argued that because the nature and circumstances of Mr. Jackson's offense conduct was more aggravated than Mr. Edwards, and because

Mr. Edwards' history and characteristics were at least as mitigated as Mr. Jackson's, a sentence that more than doubled Mr. Jackson's would create unwarranted disparities. ST8–9, 11.

Each of defense counsel's arguments was specific and "non-frivolous." *Rita*, 551 U.S. at 357. And each was tethered to a relevant § 3553(a) sentencing factor. Thus, these were not "immaterial or insubstantial" arguments that the court could ignore. *See United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005).

But the district court did not respond to defense counsel's arguments regarding a 100-month sentence would create unwarranted disparities *in light of* the offense conduct. Indeed, when the court "expla[ined]" that it was imposing a 100-month sentence, it explained only the ways in which Mr. Edwards' case was more *aggravated* than Mr. Jackson's, not the ways in which it was more mitigated. For example, the court cited Mr. Edwards' helper role to Mr. Jackson's destructive actions on August 25 to be an aggravating fact against Mr. Edwards in its general analysis, but it failed to consider these same division of roles—Mr. Jackson as the leader and Mr. Edwards as the helper or silent bystander—in its unwarranted disparity. Similarly, the court initially acknowledged Mr. Edwards suffered serious mental illness, childhood sexual abuse, and the recent grievous lost of his toddler son. But it considered none of these same arguments when it concluded that Mr. Jackson had a more mitigating background. The court, in short, imposed a harsher sentence without ever engaging

with the mitigating facts that Mr. Edwards explained warranted a downward variance. This was significant procedural error.

## C. The district court's error in failing to respond to Mr. Edwards' arguments requires reversal.

The court's failure to respond to Mr. Edwards' arguments requires reversal for several reasons.

First, had the court meaningfully engaged with Mr. Edwards' arguments, it might have imposed a more mitigated sentence. *See Cunningham*, 429 F.3d at 679 (holding that "[a] judge who fails to mention a ground of recognized legal merit (provided it has a factual basis) is likely to have committed an error or oversight."). Engaging with defense counsel's argument about the differences in offense conduct would have forced the court to engage with the extreme disparity in sentencing the defendants for that conduct. Had the court balanced the aggravating facts it identified against the mitigating facts that defense counsel addressed, it may well have imposed a concurrent rather than a consecutive term.

Second, the court's failure frustrates meaningful review by this Court. *See Rita*, 551 U.S. at 357. Indeed, on this record, this Court cannot be "satisf[ied] . . . that [the sentencing judge] has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Id.* at 356.

Finally, the court frustrated public confidence in a reasonable sentencing process by sentencing Mr. Edwards without addressing the facts that his codefendant,

who in the government's words was the "instigator," received a third of the time. Promoting fairness and integrity among this pair of cases was particularly important given the widespread attention to public disturbances in the wake of George Floyd's death.

### D. The sentence imposed was substantively unreasonable.

"A district court abuses its discretion and imposes an unreasonable sentence when it fails to consider a relevant and significant factor, gives significant weight to an irrelevant or improper factor or considers the appropriate factors but commits a clear error of judgment in weighing those factors." *United States v. Miner*, 544 F.3d 930, 932 (8th Cir. 2008); *see also United States v. Fronk*, 606 F.3d 452, 454 (2010).

As indicated above, the district court failed to consider the nature and circumstances of the offense and history and characteristics of the co-defendants in analyzing the need to avoid unwarranted sentencing disparities, as § 3553(a) requires. The district court improperly gave significant weight to aggravating factors in Mr. Edwards' case and little weight to his mitigating factors, while simultaneously failing to consider aggravating factors in Mr. Jackson's case and overemphasizing his mitigating circumstances. The court also attributed too much weight to Mr. Edwards' decision to exercise his constitutional rights to go to trial and remain silent, and the court committed clear error of judgment in penalizing Mr. Edwards for putting the government to its burden at trial.

Consequently, the district court's 100-month sentence was substantively unreasonable. This Court should reverse for this reason as well.

## CONCLUSION

This Court should vacate Mr. Edwards' judgment and remand for a new trial. The district court legally erred by failing to conduct the requisite balancing test under Federal Rule of Evidence 403. And it abused its discretion in admitting evidence whose unfair prejudice and confusion of the issues substantially outweighed its probative value, when adequate substitute evidence was available. The government cannot prove that erroneous admission of this evidence was harmless. This requires a new trial. At a minimum, this Court should remand for resentencing. The district court procedurally erred by failing to address adequately Mr. Edwards' arguments as to why a sentence tripling that of his co-defendant created unwarranted sentencing disparities. This, too, requires reversal.

Dated: May 25, 2022

Respectfully submitted,

*s/ Sarah Weinman*
_____
Sarah Weinman
Assistant Federal Public Defender
District of Minnesota
U.S. Courthouse, Suite 107
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5858

*Counsel for Mr. Edwards*

In the
United States Court of Appeals
For the Eighth Circuit

| United States of America, | ) | Appeal No. 22-1033 |
| Plaintiff-Appellee, | ) | |
| | ) | |
| vs. | ) | **Certificate of Compliance** |
| | ) | |
| Victor Devon Edwards, | ) | |
| Defendant-Appellant. | ) | |

1.  This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). Excluding the items listed in Rule 32(f), this brief contains 10,192 words.

2.  This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and type-style requirements of Rule 32(a)(6). This document has been prepared in proportionally spaced typeface, using Microsoft Word, in a 14-point Garamond font.

3.  The electronic version of this document has been scanned for viruses, and the scan indicates the electronic version is virus free.

Dated: May 25, 2022                    Respectfully submitted,

*s/ Sarah Weinman*

Sarah Weinman
Assistant Federal Public Defender
District of Minnesota
U.S. Courthouse, Suite 107
300 South Fourth Street
Minneapolis, MN 55415
612-664-5858

*Counsel for Mr. Edwards*

In the
United States Court of Appeals
For the Eighth Circuit

| United States of America,<br>Plaintiff-Appellee, | ) | Appeal No. 22-1033 |
|---|---|---|
| | ) | |
| vs. | ) | **Certificate of Service** |
| | ) | |
| Victor Devon Edwards,<br>Defendant-Appellant. | ) | |

I hereby certify that on May 25, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system:

A. Brief of Appellant
B. Certificate of Compliance (bound in brief)

Craig Baune, AUSA

*s/Tracey Bodway*

44